| | |
|---|---|
| **REEL PIPE, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-6646** |
| **USA COMSERV, INC.** | **SECTION "L" (5)** |

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action arises out of a time charter agreement ("the Charter") between Reel Pipe, LLC ("Reel Pipe") and USA Comserv, Inc. ("USA Comserv"). USA Comserv builds, maintains, inspects, and repairs cell phone towers. After Hurricane Maria struck Puerto Rico in September 2017, USA Comserv was contacted by several cell phone tower owners and operators to perform repairs and provide fuel for generators and other backup energy equipment.

USA Comserv claims it chartered Reel Pipe's vessel, the M/V Carol Chouest ("the Vessel"), to transport equipment and 850,000 gallons diesel fuel to Puerto Rico for the generators. The Vessel went on charter hire to USA Comserv beginning on October 2, 2017 and went off charter on October 30, 2017. Reel Pipe subsequently invoiced USA Comserv for a total of $303,008.33 for daily charter hire and other costs and expenses under the Charter, but has not been paid. Accordingly, Reel Pipe sued USA Comserv for breach of the Charter and under Louisiana's open account statute.

In answer, USA Comserv alleges that Reel Pipe breached the Charter by delivering a vessel that was unfit for its intended voyage and was incapable of transporting the amount of fuel required by USA Comserv. Furthermore, USA Comserv claims that Reel Pipe breached its contractual obligations to obtain necessary certifications and regulatory permitting for the Vessel so that she could successfully complete her voyage to Puerto Rico. Specifically, USA Comserv alleges that

Reel Pipe represented that the Vessel was capable of transporting the desired 850,000 gallons of fuel by storing additional fuel in her liquid mud tanks, but to do so, Reel Pipe needed United States Coast Guard approval. USA Comserv alleges that Reel Pipe and C-Logistics, LLC ("C-Logistics"), an affiliate of Reel Pipe, represented that the Vessel's liquid mud tanks had already been inspected and that the Vessel would easily obtain regulatory approval. Even after the Charter was executed, USA Comserv claims that Reel Pipe and C-Logistics continued to represent that the Coast Guard permit was merely a formality. USA Comserv claims it had little to no past experience chartering vessels and relied on Reel Pipe and C-Logistics as experienced vessel owners and logistics coordinators.

USA Comserv claims that Reel Pipe and C-Logistics did not secure Coast Guard approval to transport the fuel in the Vessel's liquid mud tanks. Furthermore, USA Comserv contends that the Vessel could not receive the approval because she was not a double-hulled vessel as required by regulations, a requirement Reel Pipe knew or should have known. USA Comserv states the Vessel departed for Puerto Rico with fuel stored only in the Vessel's fuel tanks, limiting the amount of fuel that could be transported. Upon arrival in Puerto Rico, the Coast Guard did not allow the Vessel to offload any fuel on the mainland because the Vessel lacked the required certificates. This allegedly forced USA Comserv to sell the excess fuel to another vessel offshore at a loss.

USA Comserv further alleges that it entered into a separate agreement with C-Logistics, in which C-Logistics agreed to coordinate all logistics and related services under the Charter. USA Comserv claims that C-Logistics failed to perform its contractual duties and that Reel Pipe has attempted to double-bill USA Comserv, once through C-Logistics for the $1,200 per day logistics fee, and again by seeking an additional 10 percent surcharge on services that should have been

performed by C-Logistics. Additionally, USA Comserv avers that C-Logistics owed it a duty to obtain all necessary permits and certificates for the Vessel's voyage to Puerto Rico and for unloading and discharging fuel in Puerto Rico, which C-Logistics failed to do. Finally, USA Comserv alleges that C-Logistics owed it a duty to use commercially reasonable efforts to contract with suppliers of goods and services at competitive market rates, but instead engaged in self-dealing and contracted with affiliates of Reel Pipe and C-Logistics at rates that were higher than other non-affiliated suppliers.

Accordingly, USA Comserv brings counterclaims against Reel Pipe and C-Logistics for breach of the Charter, breach of contract, negligent misrepresentation, and unfair trade practices.

This matter came before the Court without a jury on October 21, 2019. The Court has carefully considered the testimony of all the witnesses, the exhibits entered into evidence during trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II. FINDINGS OF FACT

1. On September 24, 2017, USA Comserv, through its chief executive officer, Mr. Jim Goff, contacted Mr. Dino Chouest and Reel Pipe concerning the rental of a vessel to carry diesel fuel and other cargo to Puerto Rico to aid USA Comserv's cell phone tower customers following Hurricane Maria. *See* Tr. Ex. 101; Tr. at 245 ll. 13–25; Tr. at 285 ll. 7–18.

2. During the initial email exchange between Jim Goff and Dino Chouest, Jim Goff asked about "transferable gas and diesel capacities." Tr. Ex. 101; Tr. at 246 ll. 11–15; Tr. at 284 l. 25, 285 ll. 1–3.

3. In response to Jim Goff's request, on September 25, 2017, Dino Chouest recommended the M/V ALYSSA CHOUEST ("ALYSSA") to USA Comserv. Tr. Ex. 102 at 1; Tr. at 285 ll. 19–23.

4. In response to Dino Chouest's recommendation, Jim Goff inquired about the ALYSSA's gasoline storage capacity. Tr. Ex. 103; Tr. at 286 ll. 9–14.

5. On September 25, 2017, Dino Chouest suggested that USA Comserv retain C-Logistics to assist USA Comserv with coordinating its shipments to Puerto Rico. Tr. Ex. 1; Tr. at 260 ll. 14–25, 261 ll. 1–3; Tr. at 38 ll. 3–10; Tr. at 287 ll. 2–10.

6. In a separate email chain from September 25, 2017 negotiating the Charter, Matthew Van Hoesen of USA Comserv inserted a comment to the PDF under subsection "17. Compliance with Applicable Laws" that asked, "Any reason for us to think that Puerto Rico would have any additional requirements that you are not aware of? I know that they are a U.S. territory, but I am not aware if the shipping regulations are the same." Tr. Ex. 105 at 15; Tr. at 458 ll. 4–14.

7. In response to Matthew Van Hoesen's email attaching his comments to the draft Charter, Tracee Cloutier sent an email on behalf of Edison Chouest Offshore,[1] stating, in relevant part, "[t]o our knowledge, there should be no additional regulations for Puerto Rico since the vessel will be sailing as a US flagged vessel." Tr. Ex. 7 at 4; Tr. at 458 ll. 15–21.

8. In the same email chain, Matthew Van Hoesen asked if the 15 percent administrative fee for third-party costs was negotiable down to 10 percent, which is what another company had quoted. Tr. Ex. 105 at 9; Tr. at 483 ll. 10–25, 484 ll. 1–4.

---

[1] Reel Pipe, LLC is an affiliate of Edison Chouest Offshore, which is a family of companies in the marine transportation business.

9.  Tracee Cloutier responded on behalf of Edison Chouest Offshore that the 10 percent rate was acceptable. Tr. Ex. 7 at 4; Tr. at 484 ll. 5–10.

10. In a September 26, 2017 email, Dino Chouest stated that "Dane and his team could help with any logistics needs [USA Comserv] may have and they are [a] great asset to imbed with [USA Comserv's] teams." Tr. Ex. 158 at 1.

11. Jim Goff then began to email Mr. Dane Vizier of C-Logistics, which included a September 26, 2017 email asking about gasoline storage on the ALYSSA. Tr. Ex. 2 at 2; Tr. at 288 ll. 21–25, 289 ll. 1–11.

12. In response, Dane Vizier responded that the ALYSSA could carry 550 gallon tote tanks and that he would need to order them. Tr. Ex. 2 at 2; *see* Tr. at 99 ll. 10–20.

13. During the September 26, 2017 email exchange between Dane Vizier and Jim Goff, Dane Vizier requested that USA Comserv send C-Logistics a Purchase Order for $1,200/day. Tr. Ex. 2 at 1; *see* Tr. at 41 ll. 1–23.

14. On September 26, 2017, Mr. Ken Goff, on behalf of USA Comserv, sent an email to the Coast Guard advising them that USA Comserv would be chartering the LIAM MCCALL (a fast boat for which USA Comserv contracted with a separate entity, Seacor Marine, LLC) and ALYSSA, and on arrival of the ALYSSA, USA Comserv would have approximately 150,000 gallons of transferable diesel available. Tr. Ex. 93 at 1; Depo. Kenneth Goff at 15 ll. 18–25, 16 ll. 1–19.

15. Meanwhile, on September 27, 2017, Dane Vizier emailed quotations for ten empty diesel tote tanks and five filled gas tanks to Jim Goff. Tr. Ex. 6; Tr. at 100 ll. 8–18, 101 ll. 1–5; Tr. at 289 ll. 1–7.

16. Also on September 27, 2017, the president of USA Comserv sent an email to Sprint stating

that it would have two ships arriving in Puerto Rico carrying diesel fuel, the second of which would be carrying 200,000 gallons of diesel fuel for purchase at $3.00 per gallon. Tr. Ex. 63 at 3; Tr. at 290 ll. 14–21, 291 ll. 7–12.

17. In the email exchange negotiating the terms of the Charter, Matthew Van Hoesen sent an email on September 28, 2017 on behalf of USA Comserv asking what day should be written as the execution date. He also wrote, "I would think it would be whatever day you have voyage approval from the USCG, please advise." Tr. Ex. 107 at 1; Tr. at 459 ll. 10–25, 460 ll. 1–2.

18. Dino Chouest responded the same day, "USCG does not approve our voyages. Once we start to take on Fuel for this charter is the on-hire time. We will sail to Tampa and then on to PR as directed." Tr. Ex. 107 at 1; Tr. at 250 ll. 17–22; Tr. at 460 ll. 3–10.

19. However, in an internal email involving Reel Pipe and its affiliates dated the same day, Dino Chouest mentioned "need[ing] a solution to Load our boats with Fuel including [Liquid Mud] tanks and go pump off shoreside in PR." Tr. Ex. 45 at 6; *see* Tr. at 254 ll. 12–21.

20. Dino Chouest also specified, "Issue is USCG approvals." Tr. Ex. 45 at 5; Tr. at 266 ll. 20–21.

21. Also on September 28, 2017, the Coast Guard said in an email to Ken Goff that "the M/V Alyssa COI does not has [sic] the ability to carry passengers but can carry cargo e.i. [sic] fuel in deck tanks." Tr. Ex. 95.

22. In response, Ken Goff emailed the Coast Guard on September 28, 2017 and stated that the "Alyssa would be transporting additional vehicle, construction supplies, and a large quantity of fuel in the vessel's below deck tanks." Tr. Ex. 96 at 1.

23. Separately, on September 29, 2017, Mr. Pat Flood of Edison Chouest Offshore sent an email to the Coast Guard which read, in relevant part:

> Edison Chouest Offshore would like to request a waiver to allow the U.S. flagged vessels . . . Carol Chouest . . . to bring diesel fuel in their cargo / liquid mud tanks to Puerto Rico for aid relief . . . If the vessels were to carry diesel fuel from Port Fourchon, LA to San Juan, PR this would be outside the scope of their COI and would require them to be inspected as tank ships. We would like to request a waiver to allow them to bring diesel fuel carried in their cargo tanks to the island while acting as an OSV in accordance with their current COI.

Tr. Ex. 9; Tr. at 168 ll. 13–25, 169 ll. 1–20.

24. In response to Pat Flood's email, Lt. Jennifer Proctor of the USCG acknowledged receipt of the waiver request. Specifically, she wrote that "[d]ue to the surge in requests, we will get back to you on what the Coast Guard intends to do regarding Waivers for your vessels." Tr. Ex. 126; Tr. at 172 ll. 18–24.

25. Pat Flood then replied to Lt. Proctor asking her if she had a timeframe on when to expect an answer to the waiver request. Tr. Ex. 129; Tr. at 173 ll. 1–5.

26. The next day, on September 30, 2017, Pat Flood again asked Lt. Proctor if there was any update on his waiver request. Tr. Ex. 130; Tr. at 173 ll. 13–21.

27. Meanwhile, on September 29, 2017, Jim Goff sent an email to Dane Vizier and Dino Chouest following up on a conversation that Jim Goff and Dane Vizier had the previous day regarding "a substitute for the Alyssa that had more fuel capacity." Tr. Ex. 17; Tr. at 43 ll. 14–19; Tr. at 104 ll. 24–25, 105 ll. 1–8; *see* Tr. at 268 ll. 22–25, 269 ll. 1–8; Tr. at 293 ll. 10–23.

28. In the same email, Jim Goff also mentioned that the Coast Guard had informed USA Comserv that the "certificate for the vessel only allows it to operate in the Gulf and a waiver would have to be obtained" and while he did not know if the waiver would be difficult to

obtain, he guessed "it needs to be obtained if [USA Comserv] stay[ed] with the Alyssa." Tr. Ex. 17; *see* Tr. at 110 ll. 11–23; *see* Tr. at 292 ll. 14–24.

29. Also on September 29, 2017, Tracee Cloutier sent an email on behalf of Edison Chouest Offshore to Matthew Van Hoesen of USA Comserv stating that "the vessel will be changing to the CAROL CHOUEST to meet your company's need for more capacity." Tr. Ex. 7 at 1; Tr. at 490 ll. 19–25; *see* Tr. at 269 ll. 9–14.

30. The Charter was thus executed by and between Reel Pipe and USA Comserv for the CAROL on September 29, 2017. Tr. Ex. 10 at 1.

31. Although the Charter does not specifically identify what cargo is being transported, it does specifically reference the option to carry fuel as cargo in Section 2d and mentions that the Charterer is limited to using the Vessel for "lawful movement of supplies, equipment and other materials incidental to its operations" in Section 10a. Tr. Ex. 10 at 1, 3.

32. On the same date as the Charter's execution date, September 29, 2017, Jim Goff inquired about the status of the liquid mud tanks. Dane Vizier responded that he was "[a]waiting ABS decision on the mud tanks." Tr. Ex. 8 at 1; Tr. at 108 ll. 9–21; Tr. at 299 ll. 24–25, 300 ll. 1–4.

33. The next day, on October 1, 2017, Jim Goff and Eric Pogoda sent emails to clients stating that USA Comserv would have 200,000 gallons of diesel fuel available for purchase in Puerto Rico. Tr. Ex. 65 at 1; Tr. Ex. 66 at 1–2; *see* Tr. at 301–02.

34. On October 2, 2017, the CAROL went on hire to USA Comserv. Tr. Ex. 117.

35. Pursuant to the Charter's requirement that all "fuel carried aboard the Vessel as cargo be paid in full by CHARTERER at the point of sale," Tr. Ex. 10 at 1, USA Comserv purchased 220,000 gallons of diesel fuel from a Chouest affiliate on October 2, 2017, Tr. Ex. 122 at

3, and 49,750 gallons of diesel fuel on October 3, 2017, Tr. Ex. 123 at 3. *See* Tr. at 115 l. 25, 116 ll. 1–6.

36. The total cost of the invoices was $510,097.25, from which Reel Pipe deducted USA Comserv's $115,000 pre-payment for fuel. Tr. Ex. 122; Tr. Ex. 123.

37. On October 3, 2017, Pat Flood sent a follow-up email to Patrick Grizzle of the USCG asking for an update on Reel Pipe's request for a waiver for the CAROL. Tr. Ex. 136 at 1; Tr. at 173 ll. 22–25, 174 ll. 1–7.

38. That same day, USA Comserv sent an email to U.S. Senator Bill Nelson's office to request assistance with access to Puerto Rico for the vessels being chartered. Tr. Ex. 67 at 1.

39. On October 4, 2017, meanwhile, Pat Flood sent an email to Pat Grizzle at the USCG to ask: "How likely is it for us to be able to get some type of exemption or amendment to carry fuel in our mud tanks to PR? . . . Right now we are only looking at the Carol Chouest but my [sic] add more vessels depending on the time frame to get approved." Tr. Ex. 14; Tr. at 174 ll. 19–22, 175 ll. 8–11.

40. In a separate email exchange, Dane Vizier sent an email on October 6, 2017 informing the Coast Guard that "[t]he Carol is currently loading at Tampa Shipyard in Tampa Florida. She will be sailing from Tampa to Puerto Rico on multiple trips with relief supplies and Diesel Fuel to supply Generators for electrical facilities." Tr. Ex. 162 at 1.

41. On the same day, Lt. Proctor sent an email to vessel operators, as well as Jim Goff and Ken Goff of USA Comserv, advising that:

> Vessels seeking to transit to Puerto Rico/USVI must be certificated for international voyages with the appropriate manning as specified on the vessel's Certificate of Inspection (COI), hold the appropriate international certificates, and be multi-certificated as a freight vessel (subchapter "I") in order to carry cargo and transit to Puerto Rico/USVI. Vessels are expected to operate within the scope of their COI.

Waivers will NOT be granted to operate outside the scope of a vessel's COI.

Tr. Ex. 161 at 1; Tr. at 178 ll. 3–14.

42. Because of the email from Lt. Proctor, Jim Goff emailed Dane Vizier on October 6, 2017 to ask, "Are we ok?" Tr. Ex. 12 at 2; Tr. at 305 ll. 2–5.

43. Dane Vizier responded on the same day stating, "We ok. We are certified to do international voyages. I think the 96 hrs notice is what they are worried about." Tr. Ex. 12 at 2; Tr. at 120 ll. 3–8; Tr. at 305 ll. 6–7.

44. But separately on the same day and regarding the Coast Guard's email, Pat Flood sent an email to Dane Vizier, Dino Chouest, Gary Chouest, and others—but not USA Comserv— in which Pat Flood advised, "Please see below. CG has said no to all waivers in regards to relief work." Tr. Ex. 12 at 4; Tr. at 120 ll. 16–25, 121 ll. 1–7. At this point, if not before, it is clear that Reel Pipe knew or should have known that the Coast Guard would not grant the CAROL a waiver to operate outside her COI. Nevertheless, Reel Pipe continued to give USA Comserv the impression that a waiver was forthcoming.

45. Dane Vizier subsequently emailed Jim Goff on the same day, stating that "[w]e asked for a waiver to convert our mud tanks back to fuel to pump in Puerto Rico. They were informed that we did convert without there [sic] consent. They do not want us to pump any fuel with out [sic] the waiver. I talked to LT Carlos and corrected there [sic] assumption that we were waiting on coast guard approval. That is why the emails are flying around. We need to give them a 96 hr notification before they arrive. We are working it now." Tr. Ex. 164 at 1; Tr. at 55 ll. 16–21; *see* Tr. at 125 ll. 8–11.

46. Meanwhile, on October 7, 2017, Pat Flood received an email from Mr. Carlos Sivilla at the Coast Guard stating that "no waivers are being entertained (for the time being). Not sure if

it's worth the time or if you just want to draft the request and hold on to it until things change." Tr. Ex. 15 at 1; Tr. at 180 ll. 23–25, 181 ll. 1–3.

47. On October 7, 2017, before the CAROL departed for Puerto Rico, Jim Goff wrote in an email: "Thanks Dane . . . I guess we don't need to top off fuel if I'm not going to be able to transfer any off. I assume that's still the case?" Tr. Ex. 13 at 1; Tr. at 69 ll. 22–25, 70 ll. 1–2.

48. Dane Vizier responded to Jim Goff's email that same day, "Correct. Not this trip." Tr. Ex. 13 at 1; *see* Tr. at 70 ll. 3–5.

49. The CAROL then departed Tampa, Florida for Puerto Rico on October 8, 2017 at approximately 5:00 p.m. Tr. Ex. 183 at 22; *see* Tr. at 70 ll. 15–17.

50. While the CAROL was en route to Puerto Rico, Jim Goff traveled to Puerto Rico. On October 12, 2017, he met with Department of Homeland Security and FEMA representatives and on October 13, 2017, he met with Commander Espino-Young of the USCG in Puerto Rico to discuss the vessels he had chartered to bring cargo to the island. Tr. Ex. 78 at 1–2; see. Tr. at 391 ll. 8–24, 392 ll. 3–23. Thus, USA Comserv was no longer relying solely on Reel Pipe and was taking other steps to ensure delivery of its cargo to Puerto Rico.

51. The next day, on October 14, 2017, Jim Goff emailed Commander Espino-Young to ask for any updates on the LIAM MCCALL and/or the CAROL. Tr. Ex. 81 at 2; Tr. at 393 ll. 8–23.

52. Commander Espino-Young replied that for the CAROL, the Marine Inspector would be visiting the Vessel to "see regarding the Mud Tank conversion for fuel, to see what can be done." Tr. Ex. 81 at 2.

53. That same morning, Jim Goff emailed Dane Vizier to ask how much "excess diesel [was] on the Carol" and Dane Vizier responded "180,000 gallons." Tr. Ex. 18; *see* Tr. at 135 ll. 5–8.

54. Jim Goff then replied to Commander Espino-Young's email asking, "Can the Carol Chouest be transfer [sic] the fuel that she is carrying in her existing tanks? I believe it will have approximately 200,000 gallons of diesel, which would be of considerable use to us in our support of the Sprint system." Tr. Ex. 81 at 1; Tr. at 396 ll. 2–16.

55. Later that day, Jim Goff emailed Dane Vizier again stating: "You mentioned that the Coast Guard and ABS had certified the tanks on the Carol for conversion to Diesel . . . Can you send that to me. [sic] I had a meeting with the Coast Guard in San Juan yesterday about my fuel situation (not being able to transfer fuel). They are sending an inspector to look at the tanks tomorrow to 'see what can be done.' Not sure what that means, but the paperwork you already have may suffice and enable us to bring more on the next shipment." Tr. Ex. 19; *see* Tr. at 73 ll. 22–25, 74 ll. 1–7; Tr. at 308 ll. 9–22.

56. Dane Vizier responded to Jim Goff that evening, stating: "It's not done yet. We are waiting on coast guard and ABS now to change the vessels [sic] class to diesel carrier." Tr. Ex. 19; Tr. at 74 ll. 8–12; *see* Tr. at 131 ll. 10–25, 132 ll. 1–10; Tr. at 309 ll. 1–11.

57. Meanwhile, the CAROL had arrived in Puerto Rico during the morning of October 14, 2017, Tr. Ex. 183 at 40, but she was not allowed to discharge her diesel fuel in Puerto Rico, Tr. at 307 ll. 20–23.

58. Jim Goff contacted Dane Vizier about the CAROL's inability to discharge fuel. *See* Tr. at 308 ll. 6–22, 309 ll. 12–25, 310 ll. 1–5.

59. In a text exchange during the evening of October 14, 2017, Dane Vizier told Jim Goff:

"Mr. Gary [Chouest] said we can pump out of our day tanks on the Carol if you need the fuel. Tell coast guard it is a life threatening situation." Tr. Ex. 20; Tr. at 134 ll. 7–21; Tr. at 309 ll. 12–25, 310 ll. 1–9.

60. USA Comserv ultimately had to partially offload diesel fuel to another vessel docked in Puerto Rico, the GENIE LAB, because the CAROL was not authorized to offload fuel to shore. Tr. at 310 ll. 10–25, 311 ll. 1–9; Tr. Ex. 177.

61. The GENIE LAB then pumped the fuel onshore to a wholesale distributor who purchased USA Comserv's diesel fuel at a loss to USA Comserv. Tr. at 312 l. 25, 313 ll. 1–15.

62. After the CAROL transferred fuel to the GENIE LAB, the CAROL departed Puerto Rico and headed to Port Everglades, Florida. Tr. Ex. 183 at 46.

63. On October 17, 2017, Pat Flood sent another email to the Coast Guard requesting that the CAROL be given permission to carry diesel fuel to Puerto Rico for hurricane relief work. Tr. Ex. 23; Tr. at 182 ll. 21–25, 183 ll. 1–4, 10–12.

64. Meanwhile, on October 19, 2017, Owen Mims of the USCG emailed Pat Flood, Dane Vizier, Jim Goff, and other vessel owners and operators attaching the Coast Guard's policy on relief efforts for Puerto Rico. In addition, Mims explained that if a party is requesting a waiver or amendment to the COI, the party should submit vessel documentation as well as justification as to why the USCG should grant an exemption from the regulations. Tr. Ex. 24 at 1; *see* Tr. at 183 ll. 18–25, 184 ll. 7–22.

65. In an attachment to that email from the USCG, in a document with the subject, "Guidance on Hurricane Maria Relief Vessels Response Posture and Efforts to Support the Commonwealth of Puerto Rico and U.S. Virgin Islands," the Coast Guard stated, "Vessels may carry hazardous cargoes only as permitted by the vessel's COI. Waivers will not be

granted to carry hazardous cargoes outside what is authorized by the vessel's COI." Tr. Ex. 24 at 8; Tr. at 185 ll. 9–16.

66. Regarding the email from the USCG, Jim Goff asked Dane Vizier, "What does this mean for the Carol? Have you or will be giving [sic] the certificates they are asking for? Tr. Ex. 25 at 1; Tr. at 82 ll. 4–7; Tr. at 318 ll. 21–25, 319 ll. 1–6.

67. Dane Vizier then responded, "It does not affect the Carol. We are I certified 'international' and are solas classified. Not (sic) problem Jim." Tr. Ex. 25 at 1; Tr. at 82 ll. 10–14; Tr. at 319 ll. 7–13.

68. Also on October 19, 2017, in a separate email chain, Jim Goff emailed Dane Vizier to check on when the approval for the conversion of the CAROL's mud tanks to fuel tanks would be completed. Dane responded: "Sent coast guard a [sic] email this afternoon. Will call them in the morning. It's like pulling teeth Jim. They are very slow. Will do my best." Tr. Ex. 26 at 1; Tr. at 79 ll. 11–21; *see* Tr. at 319 18–25, 320 ll. 1–10.

69. However, Dane did not call the Coast Guard to follow up the next morning. Tr. at 80 ll. 4–6.

70. On October 20, 2017, the CAROL arrived in Port Everglades, FL. Tr. Ex. 183 at 58.

71. On the same day, Pat Flood responded to Owen Mims and Pat Grizzle of the USCG and again requested a waiver for the CAROL to carry "excess diesel fuel" to Puerto Rico. Tr. Ex. 27 at 1; Tr. at 187 ll. 1–25.

72. Also on October 20, 2017, in a separate email, Pat Flood informed Dane Vizier he would not have an answer from the Coast Guard about the request for CAROL to carry fuel for another two to three days, as "CG is not being accommodating. Everything I have tried keeps getting met with roadblocks." Tr. Ex. 146 at 1–2; Tr. at 186 ll. 12–23.

14

73. Meanwhile, on October 23, 2017, Jim Goff emailed Dane Vizier asking, "Who is your contact at the coast guard for this with the Coast Guard [sic]? I am escalating this [mud tank conversion] to Homeland Security but need to give him a point of contact." Tr. Ex. 83 at 1; Tr. at 83 ll. 3–10.

74. In a separate email chain that same day, Patrick Grizzle of the USCG requested that Pat Flood or someone from Edison Chouest Offshore provide an official request on company letterhead outlining which vessels intended to operate in Puerto Rico. Tr. Ex. 147 at 2; Tr. at 188 ll. 15–23.

75. On October 24, 2017, Lt. Proctor confirmed to Pat Flood that the USCG "will not process any exemption request until we receive an official business letter requesting a waiver." Tr. Ex. 147 at 1–2; Tr. at 189 ll. 12–25.

76. Pat Flood then forwarded Lt. Proctor's email to both Jim Goff and Dane Vizier that same day, explaining that the USCG has asked for an official waiver or exemption request on company letterhead. Tr. Ex. 147 at 1.

77. Jim Goff responded to Pat Flood and asked whether the letter to the USCG needed to come from USA Comserv or from Reel Pipe. Pat Flood explained, "It should come from us, they had our request for over a week before they asked for the written letter head request." Tr. Ex. 147 at 1; Tr. at 190 ll. 8–21.

78. Both USA Comserv and Reel Pipe then worked to draft an official letterhead request to the USCG seeking a waiver for the CAROL. Tr. Ex. 40 at 1–2; Tr. Ex. 84 at 1; Tr. Ex. 175 at 1.

79. On October 24, 2017 and October 25, 2017, respectively, USA Comserv and Edison Chouest Offshore submitted written waiver requests to the USCG seeking a waiver for the

15

CAROL to carry fuel in her mud tanks. Tr. Ex. 41; Tr. Ex. 85.

80. On October 25, 2017 in the evening, Ken Goff emailed Dane Vizier stating, "Dane, We have decided the best thing for us to do at this point is to send the Carol home. What are our next steps in getting this done?" Tr. Ex. 29 at 2; Tr. at 83 ll. 21–25.

81. On October 26, 2017, the CAROL departed Port Everglades, FL and began her journey to Port Fourchon, LA. Tr. Ex. 183 at 76.

82. On October 26, 2017, Jim Goff emailed Dane Vizier stating, "Please let me know if you receive the diesel waiver for Puerto Rico from the Coast Guard. Do you have any expectations on the length of time to receive a waiver?" Tr. Ex. 29 at 1; Tr. at 84 ll. 10–16. Jim Goff thus still believes that the only thing needed was a waiver authorizing the CAROL to carry diesel fuel in her mud tanks.

83. Dane Vizier responded the same day, stating "Coast guard said 7 to 10 days. Ken sent the [CAROL] back to Fourchon this morning. If we get waiver don't know if carol will be available. I'm bidding the Carol to run fuel to BVI." Tr. Ex. 29 at 1; Tr. at 84 ll. 17–22.

84. On October 30, 2017, the CAROL arrived in Port Fourchon, LA and went off charter hire. Tr. Ex. 183 at 88; Tr. at 85 ll. 5–7; Tr. at 416 ll. 23–25.

85. On October 31, 2017, Jim Goff emailed Lt. Proctor asking if a waiver had been issued for the CAROL to operate in Puerto Rico for USA Comserv's response and recovery efforts. Tr. Ex. 150 at 2; Tr. at 417 ll. 1–14.

86. On November 1, 2017, Lt. Proctor replied that the waiver was still being processed and that USA Comserv would receive a response the following day. Tr. Ex. 150 at 1; Tr. at 418 ll. 3–6.

87. On November 2, 2017, Jim Goff again emailed Lt. Proctor for an update on the waiver for

the CAROL. Tr. Ex. 30 at 1; Tr. at 418 ll. 7–12.

88. The next day, the Coast Guard forwarded a response they had sent to Dino Chouest the previous day regarding the waiver request. Tr. Ex. 30 at 1; *see* Tr. at 191 ll. 22–25, 192 ll. 1–6; Tr. at 418 ll. 13–18.

89. In the letter from the Coast Guard to Dino Chouest, dated November 2, 2017, the Coast Guard explained that they were denying the request for a "permit to carry fuel in liquid mud cargo tanks" because vessels that are trying to carry "flammable and combustible cargoes" in their tanks must "meet the double hull requirements." The Coast Guard stated, "Records indicate that the M/V CAROL CHOUEST does not meet the double hulled standards . . . The Coast Guard is not authorized to waive the required construction standards for double hull vessels." Tr. Ex. 110. The evidence thus indicates that it was never possible for the CAROL to receive the necessary waivers to carry fuel in her mud tanks because the Vessel did not have a double-hulled bottom.

90. Following the end of the time charter, Reel Pipe invoiced USA Comserv for charter hire, despite the CAROL's inability to deliver and offload fuel to shore in Puerto Rico. Tr. Ex. 117.

91. Reel Pipe also invoiced USA Comserv for expenses incurred for C-Logistics' services. Tr. Ex. 119.

92. Pursuant to the Charter Section 14a, USA Comserv agreed to pay a ten percent administrative fee to Reel Pipe for expenses relating to procurement of items. Tr. Ex. 10 at 4; Tr. Ex. 119.

### III.    CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333. Furthermore, the

Court has supplemental jurisdiction over USA Comserv's Louisiana state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in the Eastern District of Louisiana. Jurisdiction and venue are not contested by the parties.

### A. Breach of Time Charter Claims Between Reel Pipe and USA Comserv

2.  A time charter is a maritime contract governed by general maritime law. *Lytal Enters. v. Newfield Expl. Co.*, No. CIV.A.06 0033, 2006 WL 2990124, at *3 (E.D. La. Oct. 18, 2006) (citing *Morewood v. Enequist*, 64 U.S. 491 (1860)); G. Gilmore & Black, *The Law of Admiralty* § 4-1 (2d ed. 1975). In the instant case, the parties agree that Reel Pipe and USA Comserv executed the Time Charter on September 29, 2017.

3.  The elements of a breach of contract claim under federal maritime law are: (1) a contract between the parties; (2) a breach of that contract; and (3) damages. *FEC Heliports, LLC v. Hornbeck Offshore Operators, LLC*, No. CV 15-4827, 2016 WL 5678557, at *5 (E.D. La. Oct. 3, 2016) (citing 17A Am. Jur. 2d Contracts § 702 (2016)).

4.  "When interpreting a maritime contract, the general rules of contract construction and interpretation apply." *Baywater Drilling, LLC v. Sw. Energy Partners, LLC*, No. CV 16-7968, 2017 WL 3658862, at *3 (E.D. La. June 23, 2017), *aff'd sub nom. Baywater Drilling, L.L.C. v. Sw. Energy Partners, L.L.C.*, 721 F. App'x 330 (5th Cir. 2018); *see also Marine Overseas Services v. Crossocean Shipping, Co.*, 791 F.2d 1227, 1234 (5th Cir. 1986); *Ogea v. Loffland Brothers Co.*, 622 F.2d 186, 190 (5th Cir. 1980).

5.  The Court is required to read each provision of the Charter in light of the others, so as to give each provision the meaning reflected by the contract as a whole. *Baywater Drilling, LLC*, 2017 WL 3658862, at *3 (citing *Southwestern Engineering Co. v. Cajun Elec. Power Co-op.*, 915 F.2d 972, 980 (5th Cir. 1990)). Moreover, each provision of the Charter must

be read in such a way that renders them effective rather than meaningless. *Id.* (citing *Lewis v. Hamilton*, 652 So. 2d 1327, 1330 (La. 1995)).

6. "The determination of whether a maritime contract is ambiguous is a question of law for the Court." *Lytal Enters. v. Newfield Expl. Co.*, No. CIV.A. 06-0033, 2007 WL 1239130, at *4 (E.D. La. Apr. 27, 2007); *see also Thornton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir.1979), *opinion modified on denial of reh'g,* 597 F.2d 62 (5th Cir. 1979) ("The generally accepted rule is that the interpretation of a contract is a question of law, not fact . . . .").

7. A contract is unambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004) (internal citations omitted).

8. When a contract is ambiguous, however, the Court may consider extrinsic evidence and look beyond the written language of the contract to determine the parties' intent and the contract's meaning. *See Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332–33 (5th Cir. 1981).

9. In this case, pursuant to the Charter, Reel Pipe was required to "comply with all applicable statutes, rules and regulations with respect to the navigation of [the CAROL] imposed by the United States government and/or any of its agencies," including the United States Coast Guard. Tr. Ex. 10 at 6.

10. Reel Pipe breached this duty because the CAROL was not authorized to transport or offload diesel fuel to onshore facilities by the Coast Guard and moreover, the CAROL could not transport fuel in her mud tanks because the Vessel did not meet the double hull requirement

19

of 33 CFR 157.10(d). Tr. Ex. 110. This was either known or should have been known by Reel Pipe, an experienced vessel owner. Nevertheless, Reel Pipe represented to USA Comserv that the CAROL was an appropriate vessel to serve the needs of USA Comserv, which included the ability to transport and discharge fuel to a port in Puerto Rico.

11. There are two provisions of the Charter that allow USA Comserv to transport diesel fuel as cargo: Section 2d ("Any fuel carried aboard the Vessel as cargo shall be paid in full by CHARTERER at the point of sale.") and Section 10a ("CHARTERER agrees to restrict the use of the Vessel solely to the lawful movement of supplies, equipment and other materials incidental to its operations . . . ."). Tr. Ex. 10 at 1, 3.

12. Section 2d of the Charter clearly contemplated and allowed for USA Comserv to transport diesel fuel as cargo. Tr. Ex. 10 at 1 (("Any fuel carried aboard the Vessel as cargo shall be paid in full by CHARTERER at the point of sale.").

13. Meanwhile, although the Charter does not specifically identify what cargo is being transported, Section 10a does mention that the Charterer is limited to using the Vessel for the "lawful movement of supplies, equipment and other materials incidental to its operations." Tr. Ex. 10 at 3.

14. The Court concludes that there is sufficient ambiguity in what comprises "supplies, equipment, and other materials incidental to [] operations," Tr. Ex. 10 at 3, so as to allow the Court to consider extrinsic evidence to interpret the Charter.

15. Based on the testimony elicited at trial, as well as the numerous emails exchanged among the parties, it is clear that USA Comserv intended to transport and deliver diesel fuel onshore in Puerto Rico and that Reel Pipe was aware of USA Comserv's intentions.

16. "Every contract imposes upon each party a duty of good faith and fair dealing in its

performance and its enforcement." Restatement (Second) of Contracts § 205 (1981)); *see also Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003); *Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 526 n.11 (3d Cir. 1996); *Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 274–75 (2d Cir. 1992). Louisiana law also imposes a duty to perform contracts in good faith. La. Civ. Code Ann. art. 1983.

17. "If the party to the contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Overseas Philadelphia, LLC v. World Council of Credit Unions*, 892 F. Supp. 2d 182, 189 (D.D.C. 2012) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C.2006)).

18. Because Reel Pipe delivered a vessel to USA Comserv that it knew or should have known could not perform pursuant to the Charter and the intent of the parties, Reel Pipe materially breached its contract with USA Comserv.

19. As a result of this breach, USA Comserv suffered damages that should be assessed so that USA Comserv, as the injured party, is restored "to the position [it] would have occupied had the breaching party performed the contract." *ARV Offshore Co. v. Con-Dive, L.L.C.*, 514 F. App'x 524, 527 (5th Cir. 2013); *see also* Thomas J. Schoenbaum, 2 *Admiralty & Mar. Law* 11-17 (5th ed.) (measure of damages for breach of charter party based on recoverable damages for breach of contract).

20. The Court does not conclude that a rescission of the Charter is warranted in this matter because USA Comserv had the opportunity to terminate the Charter and immediately send the Vessel back when it realized the Vessel could not perform under the terms of the Charter and the intent of the parties, regardless of the reason. USA Comserv had to know

that there was a serious problem with the CAROL performing the intended tasks because USA Comserv had contacted a U.S. Senator's office and a federal agency to resolve the matter. But USA Comserv chose not to terminate the Charter and immediately send the Vessel back. Therefore, the Court will not award USA Comserv all amounts it paid for the Vessel, less the sale price of the diesel fuel sold to Northstar, because USA Comserv unreasonably delayed extracting itself from the situation.

21. Instead, the Court concludes that USA Comserv suffered the following damages due to Reel Pipe's breach of the Charter: loss on the fuel offloaded to the GENIE LAB and subsequently sold to Northstar; loss on Port Everglade fees for the time the CAROL was waiting for Reel Pipe and C-Logistics to purportedly obtain documentation that would allow the CAROL to transport and offload fuel from the Vessel's liquid mud tanks; and lost profits on the fuel the Vessel carried in her cargo tanks that it could not sell onshore in Puerto Rico for a profit.

22. The Court does not conclude that USA Comserv is entitled to recovery for fuel purchased in Puerto Rico instead of Louisiana, since USA Comserv has not demonstrated that it had executed contracts with its clients in Puerto Rico that were left unfulfilled due to Reel Pipe's breach of the Charter. USA Comserv's emails with its clients merely state that the former would have fuel available for purchase at the rate of $3.00/gallon. Tr. Ex. 63 at 3.

23. The Court also does not conclude that USA Comserv is entitled to a refund of Reel Pipe's 10 percent administrative fee for the fuel purchased in Louisiana, since this was a percentage that USA Comserv negotiated and is the same amount that USA Comserv said another company had quoted to them. Tr. Ex. 105 at 9.

24. Furthermore, the Court does not conclude that USA Comserv is entitled to a reduction in

charter hire because USA Comserv chose to keep the CAROL under charter for an unreasonable time while Reel Pipe continued to seek regulatory approvals, rather than sending the Vessel back immediately after USA Comserv reasonably should have realized that the Vessel could not fulfill the purpose for which it had been chartered. In fact, even after the CAROL had been sent back by Ken Goff, Jim Goff again emailed Dane Vizier asking to be updated on when the diesel waiver would be received from the Coast Guard, Tr. Ex. 29 at 1, implying that Jim Goff was still considering using the CAROL if she obtained the required regulatory approvals, regardless of how long it took.

25. The Court thus concludes that the damages USA Comserv suffered due to Reel Pipe's breach of the Charter are as follows:

| | | |
|---|---|---|
| Loss on fuel sold to Northstar | $ | 42,838.92 |
| Gain from Reel Pipe re-purchase | $ | (4,006.43) |
| Loss on Port Everglades fees | $ | 16,626.00 |
| Lost profits on fuel in cargo tanks | $ | 177,405.80 |
| TOTAL | $ | 232,864.29 |

Tr. Ex. 188 at 1–2.

26. Accordingly, the elements of a breach of contract claim under federal maritime law have been satisfied: (1) a contract existed between Reel Pipe and USA Comserv; (2) Reel Pipe breached that contract by delivering a vessel that it knew or should have known could not perform under the terms of the Charter and the intent of the parties; and (3) USA Comserv suffered damages for a reasonable period of time as a result of Reel Pipe's breach. *See FEC Heliports, LLC*, 2016 WL 5678557, at *5.

27. Further, a party is excused from performance of a contract when the other party has materially breached the contract. *Lytal Enters.*, 2007 WL 1239130, at *4 (citing *Todd Shipyards Corp. v. Turbine Service*, 467 F. Supp. 1257, 1306 (E.D. La. 1978); *Motiva*

23

*Enterprises, L.L.C. v. St. Paul Fire and Marine Ins. Co.*, 445 F.3d 381, 386 (5th Cir. 2006)).

28. Because the Court concludes that Reel Pipe materially breached the Charter as discussed above, USA Comserv is not required to pay any additional amounts to Reel Pipe set forth in the Charter.

## B.  USA Comserv's Breach of Contract Claim Against C-Logistics

29. "A contract requires an offer, acceptance that matches the offer and consideration." *Nat'l Marine v. Glencore, Ltd.*, No. CIV. A. 95-2682, 1998 WL 118087, at *3 (E.D. La. Mar. 16, 1998) (internal citations omitted). These basic principles of contract law also apply to maritime contracts. *Id.* (citing *P.E.P. Shipping (Scandinavia) APS v. Noramco Shipping Corp.,* 1997 A.M.C. 2933, 1997 WL 358118 (E.D. La. 1997). Moreover, "an oral contract is sufficient to form a maritime contract." *Id.* (citing *Alamo Barge Lines v. RIM Maritime Co., Ltd.,* 596 F.Supp. 1026 (E.D. La. 1984)).

30. However, courts should not admit antecedent negotiations to change or contradict subsequent terms expressed in a written contract. *Har-Win v. Consol. Grain & Barge Co.*, 794 F.2d 985, 987 (5th Cir. 1986); *see also Rambo Assocs. v. S. Tama Cty. Cmty. Sch. Dist.*, 487 F.3d 1178, 1189 (8th Cir. 2007) ("[A]n express contract necessarily trumps any implied one when there is a conflict between the two.").

31. In this case, USA Comserv relies on the Purchase Order it issued to C-Logistics as evidence of a contractual relationship between USA Comserv and C-Logistics. Tr. Ex. 2 at 1.

32. But Section 2(c) of the Charter incorporates the terms of the prior Purchase Order between USA Comserv to C-Logistics. Specifically, the Charter expressly states that USA Comserv must pay Reel Pipe for "$1,200 per day for a C-Logistics coordinator to

coordinate receiving of equipment, loading of equipment and manifest of all equipment for the charter." Tr. Ex. 10 at 1.

33. Because the Charter states that USA Comserv agrees to pay Reel Pipe for C-Logistics' services, the Court concludes that USA Comserv's contention that a separate contract existed between USA Comserv and C-Logistics is in direct conflict with the express terms of the Charter.

34. The Court thus concludes that there was no separate contract between USA Comserv and C-Logistics and, therefore, there was no breach of contract by C-Logistics.

### C. USA Comserv's Negligent Misrepresentation Claim Against Reel Pipe and C-Logistics

35. To recover for negligent misrepresentation under Louisiana law, a plaintiff must demonstrate that three elements are met: "(1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty; and (3) the breach must have caused damages to the plaintiff." *Schaumburg v. State Farm Mut. Auto Ins. Co.*, 421 F. App'x 434, 440 (5th Cir. 2011) (quoting *Cypress Oilfield Contractors v. McGoldrick Oil Co.*, 525 So. 2d 1157, 1162 (La. App. 3 Cir. 5/11/88)).

36. Louisiana negligent misrepresentation cases are evaluated using the duty-risk analysis, which is employed on a case-by-case basis. *Daye v. Gen. Motors Corp.*, 97-1653 (La. 9/9/98); 720 So. 2d 654, 659 (internal citations omitted).

37. "As part of the duty-risk analysis, the plaintiff must show that 'the risk of harm was within the scope of protection afforded by the duty breached.'" *Schaumburg*, 421 F. App'x at 440 (quoting *Smith v. Roussel*, 2000-1028 (La. App. 1 Cir. 6/22/01); 809 So.2d 159, 164–65). "In determining the limitation to be placed on liability for a defendant's substandard

conduct, the proper inquiry is how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone. Absent an ease of association between the duty breached and the damages sustained, there is no legal fault." *Id.* (quoting *Smith*, 809 So.2d at 164–65).

38. Furthermore, "[t]he Louisiana Supreme Court has held that a duty to provide correct information was 'imposed by law based upon policy considerations due to the tortfeasor's knowledge of the prospective use of the information, which expands the bounds of his duty of reasonable care to encompass the intended user.'" *Id.* at 440–41 (quoting *Barrie v. V.P. Exterminators, Inc.,* 625 So. 2d 1007, 1016 (La. 1993)).

39. The "theme" in negligent misrepresentation cases "is that one is liable for negligent disclosure if he has superior knowledge and knows the other party is relying upon him for such knowledge." *Id.* (quoting Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 5.07[8] (2d ed. 2004)). In this case, the evidence supports the conclusion that Reel Pipe had "superior knowledge" of the Vessel's capacity to carry out the purpose for which USA Comserv chartered her and that USA Comserv relied on Reel Pipe's knowledge.

40. However, Louisiana courts also require a plaintiff to prove justifiable reliance on the alleged misrepresentation. *Abbott v. Equity Grp.*, 2 F.3d 613, 624 n.38 (5th Cir. 1993) (citing *Commercial Nat. Bank v. Audubon Meadow Part.*, 566 So. 2d 1136, 1139 (La. App. 2 Cir. 8/22/90)); *see also Busby v. Par. Nat. Bank*, 464 So. 2d 374, 377 (La. App. 1 Cir. 2/26/85); *Simmons, Morris & Carroll, LLC v. Capital One, N.A.*, 49,005 (La. App. 2 Cir. 6/27/14); 144 So. 3d 1207, 1215).

41. In this case, the Court concludes that Reel Pipe owed USA Comserv a legal duty to supply

correct information regarding the regulatory approvals and permits that would be needed to transport fuel and offload it onshore in Puerto Rico. Moreover, Reel Pipe breached that duty by misrepresenting to USA Comserv that the CAROL either already had the regulatory approval needed or that the approval was forthcoming and simply a formality. Moreover, the facts clearly indicate that Reel Pipe had "superior knowledge" of the chartering process and that it would have been reasonable for USA Comserv to simply rely on Reel Pipe's representations. However, USA Comserv did not only rely on Reel Pipe to navigate the chartering and waiver approval process, but instead, USA Comserv inserted itself in the process. USA Comserv was also in direct communication with the United States Coast Guard throughout the time period in question, USA Comserv received the emails from the Coast Guard denying the various waiver requests, Jim Goff met with representatives of the Coast Guard in Puerto Rico to try to move the process along, and USA Comserv sent an email to U.S. Senator Bill Nelson's office to request assistance with access to Puerto Rico for the vessels they were chartering. USA Comserv's reliance on Reel Pipe's misrepresentations was therefore not justifiable, as USA Comserv independently obtained information about the waiver approval process and the lack of progress with the CAROL's waiver, which USA Comserv should have then used to make a decision about whether to keep the CAROL on hire or release her and immediately sue for breach of contract.

42. The Court therefore concludes that USA Comserv did not justifiably rely on Reel Pipe's misrepresentations regarding the requested approvals and USA Comserv's negligent misrepresentation claim under Louisiana law is not supported by the evidence presented in this case.

**D. USA Comserv's Unfair Trade Practices Claim Against Reel Pipe and C-Logistics**

43. The Louisiana Unfair Trade Practices Act ("LUTPA") proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405.

44. "Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages." La. Rev. Stat. § 51:1409.

45. But "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious." *Turner v. Purina Mills*, 989 F.2d 1419, 1422 (5th Cir. 1993) (internal citations omitted).

46. For a plaintiff to recover under the statute, the plaintiff must "prove some element of fraud, misrepresentation, deception or other unethical conduct." *Omnitech Intern. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994). Courts determine what constitutes an unfair trade practice on a case-by-case basis. *Id*.

47. The Louisiana Supreme Court has concluded that the range of prohibited practices under LUTPA is narrow and "only egregious actions involving elements of fraud, misrepresentation, deception or other unethical conduct will be sanctioned based on LUTPA." *Cheramie Servs. v. Shell Deepwater Prod.*, 2009-1633 (La. 4/23/10); 35 So. 3d

1053, 1060.

48. "Fraud, misrepresentation, deception, and similar conduct is prohibited; mere negligence is not." *Turner*, 989 F.2d at 1422 (citing *Marshall v. Citicorp Mortg. Inc.*, 601 So. 2d 669, 670 (La. App. 5 Cir. 4/15/92). Moreover, LUTPA does not stand as an alternative remedy for simple breach of contract claims. *Id*. (citing *State v. Orkin Exterminating Co.*, 528 So. 2d 198, 202 (La. App. 4 Cir. 1988). "There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Id*.

49. Moreover, the Fifth Circuit has noted that a review of Louisiana cases decided under LUTPA show that the cases often involve breaches of ethical standards in employee-employer relationships or preventing unfair trade practices between competitors. *See Turner*, 989 F.2d at 1422; *see also Landreneau v. Fleet Fin. Grp.*, 197 F. Supp. 2d 551, 557 (M.D. La. 2002) ("Louisiana law suggests that LUTPA protects consumers and business competitors only, and the 'real thrust'" of LUTPA is to deter injury to competition. Where the plaintiffs are not in competition with the defendants, it appears that most courts treat the claim as a breach of contract claim, which is not actionable under LUTPA.")

50. In the instant case, the parties are not competitors, nor are they engaged in an employer-employee relationship. Moreover, USA Comserv's allegations that (1) Reel Pipe provided a vessel that was unable to transport diesel fuel cargo to Puerto Rico, (2) Reel Pipe sold fuel knowing USA Comserv could not offload the fuel without a waiver of the CAROL's COI, (3) Reel Pipe and C-Logistics deliberately concealed the denial of the Coast Guard waiver from USA Comserv, and (4) Reel Pipe billed USA Comserv for excessive mark-ups do not, even if true, rise to the level of "egregious actions involving elements of fraud,

misrepresentation, deception or other unethical conduct" that Louisiana courts sanction under LUTPA. *See Cheramie Servs.*, 35 So. 3d at 1060. At most, USA Comserv has a simple breach of contract claim against Reel Pipe—which, as discussed above, the Court concludes that USA Comserv may recover on.

51. The Court therefore concludes that USA Comserv's LUTPA claim is not supported by the evidence presented in this case.

## IV.     SUMMARY

On the basis of the foregoing Findings of Facts and Conclusions of Law, the Court finds that Defendant/Counter-Claimant USA Comserv, Inc. has sustained damages due to Plaintiff/Counter-Defendant Reel Pipe, LLC's breach of Charter. Accordingly, USA Comserv, Inc. is entitled to recover from Reel Pipe, LLC the following damages:

| | |
|---|---|
| (a)  Loss on fuel sold to Northstar | $42,838.92 |
| (b)  Gain from Reel Pipe re-purchase | ($4,006.43) |
| (c)  Loss on Port Everglades fees | $16,626.00 |
| (d)  Lost profits on fuel in cargo tanks | $177,405.80 |
| TOTAL | $232,864.29 |

New Orleans, Louisiana this 6th day of December, 2019.

_____
UNITED STATES DISTRICT JUDGE